720 So.2d 39 (1998)
Terry SMITH
v.
Carolyn GOETZMAN and State Farm Insurance Company.
No. 97 CA 0968.
Court of Appeal of Louisiana, First Circuit.
September 25, 1998.
Rehearing Denied November 17, 1998.
*41 Erika M. Tadda, Baton Rouge, Attorney for Appellant II Plaintiff Terry Smith
Michael L. Hyman, Baton Rouge, Attorney for Appellant III Intervenor Roadrunner Towing and Recovery, Inc.
Michael E. Ponder, Eugene A. Booth, Baton Rouge, Attorneys for Appellant I Defendant City of Baton Rouge
John S. White, Jr., Baton Rouge, Attorney for Defendants Carolyn Goetzman and State Farm Mutual Automobile Insurance Company
Stephen W. Glusman, Baton Rouge, Attorney for Appellee Defendant North American Specialty Insurance Company
Before FOIL, GONZALES, WHIPPLE, KUHN and WEIMER, JJ.
FOIL, Judge.
This appeal challenges various aspects of a jury's fault determination and damage award. After a thorough review of the record, we reverse the fault finding as to one of the parties, reallocate fault and affirm the award.

FACTUAL AND PROCEDURAL BACKGROUND
Plaintiff, Terry Smith, was working as a tow truck operator when he was struck by a van driven by Carolyn Goetzman. The impact pinned him between the van and a wrecker owned by his employer. This incident was the third in a series of accidents occurring on the morning of January 25, 1993. At 10:10 that morning, a two-vehicle accident occurred on Essen Lane in Baton Rouge, Louisiana, which propelled one of the vehicles into Picardy Avenue. At the time of the incident, Essen was a four-lane highway with two lanes of travel in the southbound direction and two lanes of travel in the northbound direction. Picardy, which intersected Essen, was a two-lane street, with lanes for travel in each direction.
Corporal Ralph Albert of the Baton Rouge City Police Department was dispatched to *42 the scene. Police officers Shelton Pointer and James Crouch arrived thereafter. Officer Pointer left the scene for 20 minutes to retrieve the keys to the vehicle that was on Essen lane, and he moved that vehicle off of Essen onto Picardy street. Officers Pointer and Crouch then left the accident site.
Terry Smith and Gregory Lange, employees of Roadrunner Towing & Recovery, Inc. (Roadrunner), arrived to tow the wrecked vehicles. Smith hooked up one of the vehicles and parked his wrecker and the tow on Picardy. Officer Albert's unit was behind Smith's wrecker. The wrecker operated by Gregory Lange and the other wrecked vehicle were 25-35 feet behind the police unit.
A second accident occurred at approximately 10:52 when Goetzman struck the mirror on Gregory Lange's tow truck The record reflects that Goetzman was travelling in her van on Essen when she made a left hand turn onto Picardy. She admitted that she observed the wrecker as soon as she turned onto Picardy. Goetzman testified that traffic was still flowing in both directions on Picardy, which she characterized as "stop and go." She attested that only about six inches separated her van and the cars headed in the opposite direction toward Essen.
The evidence conflicted as to the exact location of the wreckers and the police unit on Picardy. According to Goetzman, the Lange wrecker and its tow blocked one-third of the roadway. Officer Albert stated, however, that the wrecker and its tow protruded only a few inches into Picardy.
Goetzman stated that as she eased her vehicle forward, she looked in her rear view mirror and saw another vehicle trying to go around the end of her van. She then heard a crash that was caused when her passenger side rearview mirror hit the driver's side rearview mirror on the tow truck. She admitted that she was looking in her driver's side rearview mirror at the time she heard the impact.
The individual accounts leading up to the third accident forming the basis of this lawsuit are conflicting, and the testimony of the witnesses can be summarized as follows: According to Smith, he hooked up his tow and went to Officer Albert's police car to get his wrecker slips. The officer had not yet completed the paperwork, so Smith walked towards the tow truck. Smith heard a noise and looked up to see that the driver of a van hit the mirror of the tow truck. Smith stopped the driver and informed her at her driver's side window that she hit the mirror. The driver asked that he assess the damage, and he walked in front of her van to the narrow space separating the van and the wrecker. At some point, he informed Officer Albert of the second accident.
According to Smith, while he was even with the passenger window on Goetzman's van and near the door of the wrecker, Goetzman suddenly turned her wheel toward the wrecker and "gassed it." The impact spun him around and "twisted [him] like a rag doll." Smith screamed the entire time he was pinned, which he estimated to be 25-30 seconds, and he attempted to push the vehicle off of him.
Officer Albert attested that when Goetzman struck the mirror, he was sitting in his unit calling for assistance because he felt that more traffic control was needed. He was starting to exit the unit when Smith informed him that there had been a second wreck. He and Smith walked towards the van and wrecker; he observed Smith veer off towards the wrecker, while he approached Goetzman's van. Goetzman rolled down her window and he asked her for her license. He ordered Goetzman to pull forward and in back of his police unit, which was about 25-35 feet ahead of the wrecker. At the time he gave the order, he was positioned behind her driver's side window, and he signaled her to the area he wished her to go. Goetzman, however, did not follow his directions. Instead, she turned her wheel to the right, towards the wrecker. She accelerated with her wheel turned, which the officer characterized as a "jackrabbit start." Her vehicle lurched forward and she pinned Smith against the wrecker.
Officer Albert ordered Goetzman to put her vehicle in reverse three times. She appeared extremely confused and kept shifting her gears backwards and forwards. Because of her failure to respond, he attempted to *43 open the door of the van to pull her from behind the wheel, but she locked the door and tried to roll up the window because he was yelling at her. Finally, after several moments, Goetzman calmed down and put the vehicle in reverse. He went to Smith's aid, and he assisted in pulling him from between the vehicles and putting him into the wrecker. He observed an imprint on the wrecker where Smith's body had been pressed into it. The officer went to speak to Goetzman about the third accident and she told him that she was going to tell everyone that he ordered her to run over Smith. According to Officer Albert, the injury would not have occurred if Goetzman had pulled her vehicle forward, instead of to the right, as she was instructed.
Goetzman gave a vastly different version of the events leading to the third accident. She stated that after she hit the mirror on the wrecker, Smith yelled at her to stop her van, which she did. She observed Smith go toward the police car and talk with Officer Albert. Thereafter, Officer Albert asked her for her license and told her to remain at that spot, while he went to his unit and spoke to other individuals. He returned to her driver's side window and asked her to describe the incident in which she struck the mirror. Officer Albert informed her that he was going to clear the street, and when he did, he would direct her to move her van behind his police unit.
According to Goetzman, Officer Albert stood 20 feet in front of her, turned to her and pointed his hand, directing her to move to the side. As she moved forward, under his direction, she heard a shout which she thought came fromthe right hand side of her van, next to the wrecker. She looked through each of the windows on the van two times but saw no one. The officer continued to signal her to move and she heard no further sounds and felt no movement of her vehicle.
Goetzman denied knowing that she hit Smith. She did not even know anything happened until she exited her vehicle to see what damage she caused to the wrecker's mirror, and she saw Smith who told her, "lady, you hurt me."
She also admitted, however, that she did not look out of her windows before she started to move, and that there was nothing obstructing her view outside of the passenger side window. Furthermore, she admitted that she had a clear view of the street at the time she started to move forward, and that her driver's side window was down the entire time. She explained that she did not feel it was necessary for her to look to the side because Officer Albert was standing in front of her and he had a clear view of the area between the wrecker and the van, and she relied on him to direct her as she moved forward.
This lawsuit was initially brought by Smith against Goetzman and her liability insurer, State Farm Mutual Automobile Insurance Company. Roadrunner, Smith's employer, intervened seeking to recover amounts paid to Smith for worker's compensation and medical benefits. Goetzman and State Farm filed a third party demand against Officer Albert, individually, and against the Baton Rouge City Police Department (Police Department) and the City of Baton Rouge and the Parish of Baton Rouge (City/Parish).
Smith and Roadrunner amended their petitions to name the Police Department and the City/Parish as defendants. They also added as a defendant North American Specialty Insurance Company (NAS), the uninsured/underinsured motorist carrier of Roadrunner.
Following a trial, the jury concluded that the negligence of Goetzman and the Police Department caused Smith's injuries. The jury also found that Smith failed to exercise reasonable care for his own safety, and thereby caused or contributed to his injuries. The jury found that Officer Albert was not negligent. It allocated sixty percent fault to Goetzman, thirty percent fault to the Police Department and ten percent fault to Smith.
The jury awarded damages totaling $215,174.97. In accordance with the verdict, the trial judge rendered judgment against Goetzman and State Farm in the amount of $100,000.00, against Goetzman and NAS in the amount of $29,104.98, and against the City/Parish in the amount of $64,552.49. The *44 judgment further reflects that the judgment in favor of Smith and Roadrunner and against Goetzman and State Farm was satisfied after the trial. The parties had stipulated at trial that the State Farm policy issued to Goetzman had limits of $100,000.00.
From this verdict, numerous appeals were filed. The City/Parish appealed challenging the fault finding on the part of the Police Department, urging that the Police Department should not be held at fault for the negligence of the motorist in striking Smith. Smith appealed, contending that the jury erred in finding him at fault. He also challenges the jury's $45,000.00 award for past loss wages, the $50,000.00 award for future loss of income and earning capacity, and $5,000.00 award for mental anguish as abusively low. Roadrunner filed an appeal, urging the same errors as Smith.
NAS answered the appeals, challenging the sixty percent fault allocation to Goetzman. NAS also contends that the future medical damage award is not supported by the record and should be decreased.[1]

LIABILITY
An appellate court may not disturb the conclusions reached by a jury regarding factual matters in the absence of "manifest error" or unless a particular finding of fact was "clearly wrong." LeJeune v. Union Pacific Railroad, 97-1843, p. 5 (La.4/14/98); 712 So.2d 491, 494. We may only reverse the jury's factual fault determinations if we find from the record that a reasonable factual basis does not exist for the finding of the jury, and we further determine that the record establishes that the finding is clearly wrong or manifestly erroneous. Stobart v. State, 617 So.2d 880, 882 (La.1993).
In negligence cases, a plaintiff must prove that the conduct in question was a cause-in-fact of the resulting harm, the defendant owed a duty of care to the plaintiff, the requisite duty was breached by defendant, and the risk of harm was within the scope of the protection afforded by the duty breached. LeJeune v. Union Pacific Railroad, 97-1843 at. p. 6; 712 So.2d at p. 494.
In this case, the jury found that Goetzman and the Police Department were negligent, while Officer Albert was not. Because of the vastly conflicting versions of the incident offered by Officer Albert and Goetzman, the jury's verdict signals that it believed Officer Albert's account, and rejected Goetzman's testimony that Officer Albert stood in front of her vehicle with a clear view of Smith as he instructed her to move forward. The jury obviously found that Goetzman acted unreasonably in failing to look to her right before accelerating her vehicle and had she done so, she would have seen the 6'4", 280 pound Smith standing right beside her vehicle.
These findings have a direct bearing on whether the Police Department was properly found at fault in causing Smith's injuries. Smith, Roadrunner, Goetzman and State Farm postulated two bases for the City/Parish's liability. The first was that Officer Albert was negligent in ordering that Goetzman proceed forward, when he should have seen Smith. This basis was rejected by the jury. The second was that the City/Parish was liable for the negligence of the Police Department in failing to assign an adequate number of police officers to control traffic after the first collision on Essen.
Because Officer Albert was found free from fault, the jury could only have concluded that the Police Department was negligent for failing to dispatch additional officers to the accident scene. The record reflects that at the time of the second accident, wherein Goetzman struck the mirror of the wrecker, Officer Albert was attempting to get additional officers at the scene because he felt more traffic control was needed.
We are mindful that causation is a factual question, which may not be disturbed in the absence of manifest error. However, *45 considering the record in its entirety, we can only find that it does not reasonably support the conclusion that Smith's injuries were in fact caused by the lack of adequate police control at the site.
Goetzman admitted that she could see the wrecker as soon as she turned onto Picardy, and that she was not looking forward, but was instead looking in her rearview mirror when she hit the mirror on the wrecker. None of the parties seeking to establish that the Police Department was negligent offered any evidence to show that the presence of additional police would have prevented Goetzman from striking the mirror on the wrecker.
Moreover, there is nothing in the record to show that the lack of additional police at the scene played a role in causing the third accident. The testimony establishes that at the time Smith was struck, the street was clear and Goetzman was under the direction of a police officer.
Goetzman admitted that she did not look to her right before moving forward and that nothing would have obscured her view of Smith if she had done so. Goetzman failed to follow the officer's instructions when she turned her wheel toward the wrecker and accelerated the van, rather than pulling it forward as ordered. In short, this accident occurred not because of inadequate police personnel at the site, but because a driver, who failed to observed a 6'4", 280 pound man standing one and a half feet away from her van, made an erratic maneuver against police orders and panicked, thus preventing her from responding promptly to police orders. Therefore, we conclude that the jury's finding that the actions of the Police Department were a cause of this accident is manifestly erroneous, and that ruling is reversed.
Next, we examine the jury's finding Smith at fault in causing his own injuries. At the time of the third accident, Smith's attention was no longer diverted by the task of hooking up his tow, and he was bound to exercise the same degree of care for his safety as that required of an ordinary pedestrian. The record supports a finding that he failed to exercise reasonable care for his own safety by placing himself in the narrow space between the van and the tow truck while the van had its engine running, without informing Officer Albert of his presence there. Accordingly, we find no manifest error in the jury's conclusion that Smith failed to exercise reasonable care for his own safety.

ALLOCATION OF FAULT
In its answer to this appeal, NAS challenges the assessment of fault to Goetzman as being too high. The jury's error in finding the Police Department at fault preempts its fault allocation and requires that this court assess fault de novo, without regard to the prior allocations by the jury.
In determining the percentages of fault of Goetzman and Smith, we must consider both the nature of the conduct of each party at fault and the extent of the causal relationship between the conduct and the damages claimed. Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967, 974 (La.1985). Various factors to be used in assessing the nature of the conduct include: (1) whether the conduct resulted from inadvertence or involved an awareness of danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacities of the actor, whether superior or inferior; and (5) any extenuating circumstances that might require an actor to proceed in haste, without proper thought. Socorro v. City of New Orleans, 579 So.2d 931, 942 (La.1991).
Applying these factors to the present case, we recognize that Goetzman's conduct created a great risk of harm to Smith, which could easily have been avoided if she had acted with greater caution. There was no evidence of any extenuating circumstances that might have required her to act in haste, without proper thought.
Smith inadvertently placed himself in a precarious position between two vehicles, subjecting himself to a risk of injury. Compared, however, to Goetzman's conduct in this case, we find Smith's negligence to be slight. Accordingly, we hold Goetzman ninety percent at fault for Smith's injuries, and we conclude that Smith was ten percent responsible for his own injuries.

*46 DAMAGES
Smith and Roadrunner contend that the jury erred in awarding inadequate amounts for past loss wages, future loss of income and earning capacity, past and future mental anguish, loss of enjoyment of life and inconvenience. NAS contends that the jury's award for future medical expenses is not supported by the record.
The facts pertinent to our damage review are as follows: On February 1, 1993, one week after the accident, Smith sought medical treatment complaining of back and leg pain. Dr. Herbert K. Plauche, the orthopedic surgeon who examined him, diagnosed a strain of muscles in his lower back, ordered a CAT scan of the lumbar spine, placed Smith on bed rest and ordered conservative treatment. According to Dr. Plauche, the CAT scan showed a protruding disc which produced mild pressure on the spine. He opined that it was medically likely that the protrusion resulted from the accident.
Dr. Plauche noted that on subsequent visits, Smith was improving steadily. However, on his visit in March of 1993, Dr. Plauche became concerned about Smith's emotional state, noting that he was crying and angry over the loss of his job. The record reflects that some time after the accident, Smith was fired from his job as a tow truck operator because Roadrunner's insurer cancelled him as a covered driver for having been involved in two accidents in a twelve month period.
Dr. Plauche recommended that Smith be evaluated by a psychologist, and referred Smith to Dr. Marc Zimmerman. Dr. Zimmerman, a clinical psychologist, had Smith undergo various intelligence tests, and concluded that Smith has an IQ of 76, which is in the borderline range just above retardation and just below low average intelligence. Dr. Zimmerman, who saw Smith from February of 1993 until the time of the trial, diagnosed Smith as suffering from clinical depression stemming from two sources: his injury and the pain resulting from it, as well as his feelings of betrayal and anger over his firing by Roadrunner. He believed that Smith's livelihood was important to him and his inability to return to work was extremely damaging to his ego. Dr. Zimmerman testified that he originally saw Smith on a weekly basis, but now sees him once a month. He explained that Smith reported suicidal feelings during the course of his treatment, at which time he referred him to a physician who prescribed anti-depression medication. Dr. Zimmerman opined that as of the date of the trial, Smith was in need of continuing psychotherapy.
In June of 1993, following another referral from Dr. Plauche, Smith was examined by Dr. Clifford, a neurosurgeon, who ordered additional testing. Dr. Clifford testified that all of the test results were normal, and he felt that Smith had a preoccupation with pain. He opined that Smith's pain was a "mechanical type of pain" that did not require surgical intervention, for what he described as a "long-standing soft tissue injury." In short, he noted there were a substantial number of complaints without any neurologically significant findings. He opined that Smith reached his maximum medical improvement in September of 1993 and was capable of returning to light duty work under the restriction that he not lift over 20 pounds. He stated that Smith is disabled from returning to his pre-injury employment. However, he saw no reason why, as of mid-1994, Smith could not have performed a job involving washing trucks, grass cutting and sweeping.
David Corbin, a chiropractor, began treating Smith for back pain in September of 1993. He treated Smith two to three times a week until May of 1994, when he released Smith to return on an "as needed basis." At the time of the trial, Dr. Corbin was treating Smith on the average of every two weeks.
In December of 1993, Smith saw Dr. Donald Dryer, a medical specialist who evaluates injuries, complaining of, among other things, back pain and weakness in the leg. He observed that Smith had a slight limp, and his examination revealed that Smith was suffering from muscle strains in his neck and back. Dr. Dryer examined Smith again one week before trial, and his complaints of pain remained consistent. He found muscle spasms in the back area and weakness in the extremities. He observed that Smith was dragging his foot, for which he found no *47 neurological reason. He felt that Smith was "guarding" due to fear of reinjuring or extending his existing injury. He did not believe that Smith was in need of any medications, but did opine that Smith could not return to the job of a tow truck operator.
In December of 1993, Smith returned to see Dr. Plauche, who ordered an MRI which revealed a disc protrusion. He recommended further neurosurgical evaluation and referred Smith to Dr. John Jackson, a neurological surgeon. Dr. Jackson examined Smith in January of 1994. He reviewed a CAT scan done in February of 1993, and found a moderate disc bulge at the L4-5 level and the possibility of a slight disc bulge at the L5-S1 level, noting that these bulges could explain the pain in Smith's back and legs, and they could have been caused by the accident. Due to the "fairly normal" neurological examination and minimal nature of the bulges, he recommended conservative treatment, but did not discount that surgery could be required in the future. Dr. Jackson opined that Smith could not perform any jobs requiring lifting over 25 pounds.
In February of 1994, Smith returned to see Dr. Plauche, who discharged him from his care. He advised Smith that additional orthopedic treatment would not be beneficial to him. He opined that Smith would never be able to return to his pre-injury occupation.
One month before the trial, Steven Diest, a rehabilitation counselor, performed a vocational evaluation of Smith. Considering his medical records and vocational history, he felt that Smith could not return to his former occupation as a tow truck operator, but that he could return to work in the light/sedentary category of jobs. He identified three types of jobs Smith could perform which paid a greater salary than minimum wage including: (1) auto detailer, (2) self service station attendant and (3) cashier. He believed that Smith was capable of earning in the range of minimum wage (which was $4.75 at the time) to $6.00 per hour.
Smith and his girlfriend, Donna Kingsmill, testified regarding Smith's active lifestyle prior to the accident, and his lack thereof following the accident. They noted that prior to the accident, Smith worked constantly and loved his job as a tow truck operator. He enjoyed working on cars, did all of his own yard work, and was social. After the accident, however, Smith was depressed, in pain, and did not do any type of work. Smith never returned to work at any occupation following the accident. He was offered a job by Roadrunner in June of 1994 which involved washing trucks, sweeping and cleaning the shop. He did not attempt to do this job because he felt it required too much bending and stooping. He admitted that he put in one application for employment as a radio dispatcher, but he could not recall the date. He testified that he is depressed and takes an anti-depressant daily.
Dr. William Gouvier, a clinical psychologist, evaluated Smith on two occasions shortly before the trial. He diagnosed Smith as suffering from a pain disorder associated with psychological factors stemming from his sense of abandonment and anger over the loss of his job, as well as his general medical condition. He felt that Smith suffered from a "mood disorder" due to his low back and related pain. He believed that a large part of Smith's mental state was related to his anger and feelings of betrayal over being fired by Roadrunner, and felt that Smith was exaggerating his symptoms. Dr. Gouvier testified that Smith needed continued physiological care, with an increased number of monthly sessions to ensure that his symptoms of depression did not worsen.

GENERAL DAMAGES
In reviewing an award of general damages, this court is limited to a review for abuse of the trier of fact's vast discretion. Because of the great discretion vested in the trier of fact, an award of general damages should rarely be disturbed on appeal. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that an appellate court should reduce or increase the award. Id.
*48 Smith and Roadrunner contest the $5,000.00 damage award for past and future mental anguish, loss of enjoyment of life and inconvenience as abusively low. In reviewing an attack on a general damage award, a court does not review a particular item in isolation; rather, the entire damage award is reviewed for an abuse of discretion, and if the total general damage award is not abusively low, it may not be disturbed. Pitre v. Government Employees Insurance Company, 596 So.2d 256, 260-261 (La.App. 3d Cir.), writ denied, 600 So.2d 685 (La.1992).
The jury awarded Smith $50,000.00 for past and future physical pain and suffering and $25,000.00 for permanent disability, making the total general damage award $80,000.00. Considering the medical evidence in this case, particularly the evidence demonstrating that much of Smith's mental condition stems from sources other than his pain from the injury caused by the accident, we find that the jury did not abuse its vast discretion in entering the $80,000.00 general damage award.

SPECIAL DAMAGES
A plaintiff is required to prove special damages by a preponderance of the evidence, and the findings of the trier of fact are subject to the manifest error standard of review. Johnson v. State Through Department of Public Safety and Corrections, 95-0003, p. 8 (La.App. 1 Cir. 10/6/95); 671 So.2d 454, 459, writ denied, 95-2666 (La.1/5/96); 667 So.2d 522.
Smith and Roadrunner contend that the jury erred by failing to accept uncontradicted testimony of Dr. Randolph Rice, an economic expert, that Smith suffered a past wage loss of $68,104.00 and a future loss of income of $194,081.00. The jury disregarded the economist's figures and awarded Smith $45,00.00 for past lost wages and $50,000.00 for future loss of income and earning capacity.
The record reflects that Dr. Rice used the information provided to him by Smith's attorney. He was asked to assume that Smith could return to work on June 1, 1994, at a job paying minimum wage. From the date of the accident until October 1, 1996, that wage was $4.25, and it increased to $4.75 in October of 1996. All of Dr. Rice's earnings calculations incorporated the minimum wage figure.
However, the record reasonably supports the jury's decision to award a sum lower than calculated by Dr. Rice. There was medical testimony that Smith could have returned to a light duty job in September of 1993, almost nine months earlier than the date provided to Dr. Rice. Further, the vocational rehabilitation counselor identified jobs in the minimum wage-$6.00 per hour range that Smith could have performed. Dr. Rice admitted that his calculations would have been different if the $6.00 per hour figure were taken into account; however, he did not perform this calculation. The jury obviously concluded that Smith did not demonstrate he was incapable of performing anything other than a minimum wage job, and reduced Dr. Rice's figures accordingly in entering its income loss awards. We find no manifest error in the awards, and we decline to disturb them.
Lastly, we address NAS' contention that the $15,000.00 award for future medical expenses is erroneous, contending that there is absolutely no evidence in the record to support the award.
In order to recover future medical expenses, the appellate record must establish that future medical expenses will be necessary and are inevitable. Stiles v. K Mart Corp., 597 So.2d 1012, 1013 (La.1992). When the record establishes that future medical expenses will be necessary and are inevitable, the trier of fact should not reject the award because the record does not provide the exact value, if the trier of fact can determine from the record, past medical expenses and other evidence a minimum amount that reasonable minds could not disagree would be required. See Youn v. Maritime Overseas Corp., 623 So.2d at 1262.
Dr. Zimmerman testified that Smith remained clinically depressed as of the date of the trial and was in need of continued psychotherapy at least on a monthly basis. Dr. Gouvier felt that the number of counseling sessions should be increased. Further, at the time of the trial, Smith was undergoing *49 chiropractic treatments on a schedule of every two to three weeks. Considering the record in its entirety, we find that it reasonably supports the jury's $15,000.00 award for future medical expenses, and we decline to disturb it.

CONCLUSION
For the foregoing reasons, we affirm the $215,174.97 damage award, reduced to $193,657.48 due to Terry Smith's percentage of comparative fault. The judgment entered against the City/Parish (referred to as the City of Baton Rouge in the judgment below) is reversed. In light of the settlement between plaintiffs and Goetzman and State Farm for the $100,000.00 limits of the State Farm policy, judgment is entered in favor of Terry Smith and Roadrunner Towing & Recovery, Inc. and against North American Specialty Insurance Company, the underinsured motorist liability carrier, in the amount of $93,657.47. Costs of this appeal are assessed equally to Terry Smith, Roadrunner Towing & Recovery, Inc. and North American Specialty Insurance Company.
AFFIRMED IN PART, REVERSED IN PART AND AMENDED.
KUHN, J., dissents and assigns reasons.
WHIPPLE, J., dissents and would affirm the jury verdict, thus denying both appeals.
KUHN, Judge, dissenting in part and concurring in part.
I disagree with the majority's reallocation of fault and would affirm the trial court's allocation of fault based on the jury's verdict. I concur in the majority's allocation of ten percent fault to Mr. Smith. With respect to the damage awards, I find the awards for past lost wages; future loss of income and earning capacity; and past and future mental anguish, loss of enjoyment of life and inconvenience to be abusively low. I would increase these awards as follows: past lost wages from $45,000.00 to $68,104.00; future loss of income and earning capacity from $50,000.00 to $194,081.00; and past and future mental anguish, loss of enjoyment of life and inconvenience from $5,000.00 to $50,000.00. I concur in the majority's finding that the record supports the jury's $15,000.00 award for future medical expenses.

Negligence of the Parties and Comparative Fault
Law enforcement officers have the exclusive power to regulate traffic and are duty bound to exercise this power reasonably to protect life and limb and to refrain from causing injury or harm. Blair v. Tynes, 621 So.2d 591, 596 (La.1993). Thus, once the duty to investigate and control traffic at an accident scene has been undertaken by a law enforcement officer, it must be exercised in a manner in which motorists and pedestrians are protected. See Blair v. Tynes, 621 So.2d at 595-598.
The record supports the jury's findings that the City of Baton Rouge was negligent and that Smith's injuries were caused by the lack of adequate police control at the accident site. Due to the heavy traffic conditions, an insufficient number of police officers were present to control the accident scene. The evidence supports a conclusion that the first accident involving the van and the tow truck was caused, at least in part, by the lack of an officer directing traffic. More importantly, the evidence strongly supports a finding that the accident involving Smith was caused by the lack of additional police personnel needed to properly control the scene of the accident.
The majority finds there is nothing in the record to show that the lack of additional police at the scene played a role in causing the third accident, stating the testimony establishes that at the time Smith was struck the street was clear and the driver was under the direction of a police officer. However, according to Goetzman's testimony, Mr. Lange's wrecker was blocking a portion of the street and there was not much distance between Mr. Lange's wrecker and the oncoming traffic traveling on Picardy Ave. towards Essen Lane. Thus, the jury apparently determined that the congested street was a cause of the accident in question. The jury's finding of negligence on the part of the City of Baton Rouge is not manifestly erroneous.
The record supports the jury's allocation of thirty percent fault to the City of Baton *50 Rouge. The City Police Department failed to have a sufficient number of officers to respond to the initial accident and remain present until the vehicles were cleared from the scene. The jury apparently concluded this failure posed a significant risk of injury to the workers, pedestrians and motorists present at the accident scene. The Department was in a position to have easily remedied this situation since Officers Pointer and Crouch had been sent to the accident scene. The record establishes these officers provided only minimal assistance to Cpl. Albert and left the accident scene before the vehicles involved in the first accident were towed away. The Department should have been aware of the risk of injury created by its failure to provide the police personnel needed to properly control the scene of the accident.

Damages
At the time of the trial, Smith was thirtyeight years old. He attended school through the eighth grade, but his academic performance was poor. His work experience prior to the accident was very limited. He had previously worked at a service station performing motor vehicle inspections for about two years. For the next three and one-half years, he worked as a stock man and behind the counter in the parts department for a company that serviced eighteen wheelers. The remainder of his work experience was working as a wrecker (or tow truck) driver. The evidence is uncontradicted that Smith was unable to return to work as a wrecker driver after the accident.
The psychological testing established that Smith suffers from a brain dysfunction and that Smith has an IQ of seventy-six points, slightly above the range for mental retardation and slightly below the range for low average intelligence.
The majority rejects Smith's claim that the jury abused its discretion in awarding only $45,000.00 for past lost wages when Dr. Rice's uncontradicted testimony supported an award of at least $68,104.00. The majority also rejects Smith's claim that the jury abused its discretion in awarding only $50,000.00 for future loss of income and earning capacity when Dr. Rice's testimony supported an award of $194,081.00.
The majority finds that the jury's award for past lost wages is supported by the record, concluding that Smith could have returned to a light duty job in September of 1993, nine months earlier than the date used by Dr. Rice in his calculations. However, the record does not establish that any type of job was available to Mr. Smith as of this date. Considering Smith's significant physical and mental limitations and the lack of evidence establishing that employment was available to Smith prior to June of 1994,[1] it would have been unreasonable for the jury to conclude that Smith could have returned to work prior to that date.
The majority also finds that the jury obviously concluded that Smith did not demonstrate he was incapable of performing anything other than a minimum-wage job and reduced Dr. Rice's figures accordingly in entering its income loss awards. This conclusion is based on the premise that Mr. Steven H. Deist, the vocational rehabilitation counselor, identified jobs in the minimum wage to $6.00 per hour range that Smith could have performed.
Based on Smith's vocational history and considering Smith's physical condition following the accident, Deist testified Smith was not able to return to work as a wrecker operator. Deist explained that due to Smith's educational background, Smith would be limited to light to sedentary jobs that facilitated on-the-job training. Deist stated that Smith would not be able to perform a job that requires him to stand throughout *51 the day. Deist testified that Smith could have an "aspirational goal" of working as a cashier and addressed his wage earning ability, as follows:
Q. [By counsel for Roadrunner]: And, generally, what is theI'm sorry. You testified that that was maybe a one day goal?
A. [Smith]: Yes.
Q. A cashier's job is something he could aspire to, perhaps?
A. Yes. I think that's a job that if he got it he would have one of his best opportunities to be earning a little more than minimum wage. Usually, a cashier type of position, a good skilled cashier is going to be getting more than that. It's possible to start at $6 an hour there at that position. Frankly, something like Albertson's because they really work them hard, they get someI think I've heard as much as like $10 an hour for that.
Q. But is it your opinion that he could handle a cashier job at a place like Piccadilly or Albertson's?
A. No, I don't think he could because of the volume.
Q. And, basically, the salary ranges are minimum wage to $6?
A. My rough estimate, and, you know, this is not a science, I apologize for that, but I think I can say that he's capable of earning minimum wage if we find the right position. Maximum starting salary is probably somewhere around $6 based on the fact that over the years I have seen entry level positions that can earn as much as $6.
Q. He would also need a very understanding employer, would he not?
A. The employer would have to be understanding in the knowledge of his restrictions. The employer would have to be willing to give him the time that he needs to take a break. The governmentIf I can, the government requires, you know, OSHA standards require that everyone get a break and get a lunch time if they're during the day and stuff. So that's available by law. Not always available in real life, but available by law. A person with a back injury, though, may have to take their break a little time each hour. That's usually not the situation in a work stetting. If
Q. And if there was no one else there to take his place while he took his breaks, that would pose some problems for an employer?
A. Right. The Americans With Disabilities Act states that you cannot hold a person's disability against them in trying to decide whether they can do that job; howeverand it requires you to modify a job if it's appropriate, but if it's not an appropriate modification, then, obviously, you can hire someone else in place of that person because of the needs of that job.
This testimony can hardly be said to support a finding that Smith was able to earn more than minimum-wage pay between the date of the accident and June 1994, or anytime soon after the trial of this matter. The record establishes Smith is a man of less than average intelligence and has only an eighth grade education. With these limitations and his significant physical restrictions, he will be very limited in his opportunities for future employment.
Dr. Rice calculated Mr. Smith's past lost wages to be $68,104.00, representing his loss if he had returned to work on June 1, 1994, earning a minimum wage.[2] Dr. Rice calculated Mr. Smith's future loss of income and earning capacity to be $194,081.00. The defendants did not produce any expert economic testimony to controvert Dr. Rice's calculations. The record in this case reflects no sound reason for the jury to have rejected Dr. Rice's uncontradicted expert testimony.
The majority also finds no abuse of discretion in the jury's $5,000.00 award for past and future mental anguish, loss of enjoyment of life and inconvenience. I find the lowest award appropriate under the circumstances is $50,000.00. Dr. Zimmerman's testimony *52 substantiates that the loss of Smith's job and his physical limitations following the accident have caused him a great deal of stress and severe depression. As of the time of trial Smith's depression had lasted for more than two years, and he was still suffering from depression. The record establishes his depression was caused by his chronic pain, inability to function and lack of ego strength. The testimony of Smith and Kingsmill verifies that Smith's physical disabilities attributable to the accident have severely limited his activities. Thus, I would increase this award to $50,000.00.
NOTES
[1] Although in its answer to the appeal NAS charged as error the finding of any fault on the part of Carolyn Goetzman, in its brief it only challenges the percentage of fault assessed against her, stating therein that it does not argue that the assignment of fault to Goetzman was unwarranted. We therefore consider the assignment of error pertaining to the finding of any fault on Goetzman's part to be abandoned. Uniform Rules-Courts of Appeal 2-12.4.
[1] The record establishes Roadrunner offered Smith a job as of June 1, 1994. Smith testified he had previously performed the job and knew that following his injury he could not handle the physical requirements of the job. He described the job duties as washing eighteen-wheeler trucks, washing personal vehicles, sweeping the shop area, mowing grass, dumping heavy barrels, and mopping the kitchen area with a large industrial-size mop. Dr. Clifford testified that he thought Smith would have been capable of performing a job of this nature as of the summer of 1994, if he were not required to lift in excess of ten to twenty pounds on a repetitive basis and would be allowed to sit for about ten minutes of every hour. I note the record does not establish the amount Roadrunner would have paid Smith had he accepted the job.
[2] The record establishes that minimum wage was $4.25 from the date of the accident until October 1, 1996; minimum wage was $4.75 after October 1, 1996; and after October 1, 1997, it would increase to $5.15 an hour.