McDONALD, J.,
Agreeing in part and dissenting in part.
|TI must respectfully dissent from the majority opinion in several respects. First, on the issue of solidary obligors and the finding of liability on Dow; secondly, on affirming the trial court’s refusal to grant a directed verdict on behalf of the defendants; and thirdly, applying the wrong standard of review to the jury’s award of general damages. However, having made the determination that Dow and Hebert Brothers were both liable, I be *66 lieve the majority is correct in finding the quantum award should be reduced as Hebert Brothers is only liable for its virile share.
The defendants point out that there seemed to be some confusion in this case. That seems to be an understatement. No one seemed to know whether comparative law principles applied, what solidary obli-gors meant, or what the law on virile share entails. The trial court even enlisted the assistance of a law professor to explain some of these principles.
For whatever reason, the plaintiffs set out from the start to prove that the only defendant with any liability was Hebert Brothers. I believe, as did the defendants, that they succeeded. The testimony and questioning of witnesses should be understood in that context.
Liability of Dow
The majority discusses the theory of strict liability in connection with fault on the part of Dow. However, at the charge conference between the trial court and the attorneys, the plaintiffs insisted that this was not a strict liability case, but rather a negligence case based on a failure to provide a safe place to work. They |?had requested a jury charge on strict liability but withdrew it. Thus, I believe the majority should not have gone down a road that the plaintiffs chose not to travel. If the plaintiffs did not believe strict liability was applicable, then I do not believe we should have considered it either.
Nevertheless, since the majority considered this issue, I will also do so. In examining this issue, I find that the testimony of the various experts demonstrated the increasing knowledge of the dangers of exposure to asbestosis, but none attributed any liability to Dow. Whether Dow had any liability is open to speculation and conjecture. This is easily understood considering the plaintiffs were determined and had an objective to prove none; their goal was to prove all liability on the part of Hebert Brothers.
Charles Snearl, a co-worker of Mr. Watts during much of the time that he worked at Dow, testified as follows:
Q: Okay. Did you have written procedures that you had to follow that Hebert Brothers gave you regarding the use of respirators and working asbestos?
A: Did I have written—
Q: From Hebert Brothers?
A: No.
Q: Did you ever have a Safety Manual from Hebert Brothers or any information about this is what you do when you’re working around asbestos?
A: No.
Q: Were you ever — did—did—were you ever trained from Hebert Brothers about how to properly fit the respirator on—
A: No.
Q: —or a mask on?
A: No.
[[Image here]]
Q: All right, and so Dow — did Hebert Brothers ever provide you vrith any escape respirator?
A: No.
Q: Did Hebert Brothers ever provide you with a dust mask?
A: No.
Q: Did Hebert Brothers ever provide you with Comfo Two?
A: No.
Q: Did Hebert Brothers ever provide you with anything in regards to safety? A: No.
laQ: Okay. So if we took what Hebert Brothers did when it came to safety, you would have no protection at all; would you?
*67 A: (No audible response).
Q: Is that true?
A: I mean, Dow supplied us with — with the safety, but you know, Hebert Brothers didn’t give it to us, if you’re going to say it like that.
Q: And if you’re going to have to get it from Hebert Brothers, if they were going to provide you with a safe place to work, you would have gotten nothing; right?
A: (No audible response).
Q: Is that correct?
A: Yeah; I guess.
(Emphasis added.)
The majority suggests Mr. Snearl’s testimony is less important, because he did not begin to work at Dow until 1972 some nine years after Mr. Watts began working there. The majority relies heavily on the testimony of Sirkil Pania who worked there from 1957 until 1972. However, Mr. Pania’s testimony was almost the same as that of Mr. Snearl; he stated:
Q: Let’s be right up front. Did anybody every instruct you from Hebert Brothers to put on respiratory protection when you were around that slurry, when they were dumping those bags in, and the asbestos was flying up, and the fans was pushing it down, out into the building? Anybody ever tell you to wear respiratory protection?
A: No. No.
Q: Okay. In fact, sir, the only respiratory protection you were ever given by Hebert Brothers was a little escape thing; wasn’t it?
A: Right. Right.
[[Image here]]
Q: All right. In any of your time, or I should say, did you ever have any safety meetings while you worked for Hebert Brothers?
A: About once a month.
Q: All right.
A: That’s in chlorine.
Q: In chlorine.
A: That’s right.
Q: Okay. Okay, and we can talk about the other side in a moment, but for — for purposes of — of right now, we want to talk about what you were doing with Mr. Watts. So, in the Chlorine Unit, you have a safety meeting about once a month?
A: About once a month.
Q: Okay. Was there ever, ever any time between 1963 and 1972 when you were working in the Chlorine Unit that anybody at any of those safety meetings ever discussed the dangers of asbestos? A: No.
Q: Okay. We talked for a moment earlier about the escape respirator, excuse me.
A: Right.
14Q: Did anybody for Hebert Brothers ever tell you to wear a dust mask when you worked around asbestos?
A: No.
Q: Anybody [for Hebert Brothers] ever tell you to wear a respirator when you worked around—
A: No.
Q: —asbestos?
[[Image here]]
Q: Okay, and we’ve already established that nobody at Hebert Brothers ever told you about the dangers of asbestos? A: Right.
(Emphasis added.)
Again, the questions all were concerned with the failure of Hebert Brothers to provide adequate protection for Mr. Watts or other employees. But, these questions must be considered in the context of an attempt by the plaintiffs’ attorneys to *68 prove all the responsibility was on Hebert Brothers. None of the witnesses were asked what Dow did or did not provide or did or did not tell the employees. These questions were only asked about Hebert Brothers. In spite of the lack of evidence on the issue, the majority makes a huge leap and concludes that Dow failed to take reasonable steps to prevent the injuries to Mr. Watts. There is ample evidence that Hebert Brothers failed to prevent Mr. Watts’ injuries; there is no such evidence that Dow failed to do so.
The vast majority of testimonial evidence regarding Dow’s practices was about the safety measures it instituted. Dow placed air monitors on Hebert Brothers’ employees, and provided them with safety equipment, including respirators. Dow’s plant doctor performed annual physical examinations on Hebert Brothers’ employees including chest x-rays and breathing tests, and Dow conducted safety orientations and weekly safety meetings. There is testimony that Dow supervised Hebert’s employees to the extent that Dow could cause an employee to be fired for not wearing a respirator, and that Dow employees told Hebert Brothers what work was to be done. But there was absolutely no evidence elicited by the plaintiffs that indicated an intention to establish that Dow and |fiHebert Brothers were solidarily liable. In fact, they argued vigorously that Hebert Brothers was the only party at fault.
Dow did provide the asbestos to Hebert Brothers for distribution to their employees so they could perform the tasks that Dow required. Also, there was testimony that a Dow employee was on the premises, in a supervisory capacity, when Hebert Brothers were working. However, we cannot say that Dow failed to take reasonable measures to protect persons on its premises from unreasonable risks of harm. In fact, the evidence adduced at trial established that Dow did make reasonable efforts to protect persons on its premises from harm. The plaintiffs failed to prove that these efforts were inadequate or unreasonable.
Directed Verdict/Judicial Estoppel
The plaintiffs moved for a directed verdict, arguing that it had been conclusively proven that: (1) Watts was not contribu-torily negligent; (2) Hebert Brothers was at fault; and (3) no party other than Hebert Brothers was at fault. This indicates that the plaintiffs did not have any intention of proving fault on the part of Dow, and they did not believe any proof of liability by Dow had been established. They vigorously maintained this position throughout the trial. Plaintiffs’ counsel avoided presenting any evidence of the fault of any entity other than Hebert, then advised the court that it had presented no such evidence. While I recognize that this argument is not evidence, it is certainly the plaintiffs’ opinion of the evidence.
The majority suggests this complete shift in positions is analogous to a party pleading alternative theories of liability or causes of action. The majority suggests there is no prejudice shown by Hebert Brothers and the legal effect of the plaintiffs’ inconsistent arguments is of no moment to its appellate review. This position completely ignores the facts. First, the plaintiffs’ petition made no allegations of fault on the part of Dow and alleged that Hebert Brothers was solely ^responsible for their damages. An alternative plea provides notice to the defendant of the various theories that may be raised and argued. The defendant knows what to expect and, more importantly, what he must defend against, even if it is in the nature of an alternative claim. No notice equates to prejudice to the defendant.
Secondly, this is not a case analogous to alternative pleading. Rather, it is a case *69 where judicial estoppel should apply. The doctrine of judicial estoppel prohibits parties from deliberately changing positions according to the exigencies of the moment. The doctrine is intended to prevent the perversion of the judicial process and prevents playing fast and loose with the courts. Lowman v. Merrick, 2006-0921 (La.App.lst Cir.3/23/07), 960 So.2d 84, 92.
Plaintiffs’ counsel argued strenuously as follows in describing the evidence (or lack of evidence as to any fault by Dow):
There’s no evidence ... of fault of any other party, other than the employer. Hebert Brothers, in this case. I know there has been some talk about what goes on the verdict, but just for the record, we move [for] Directed Verdict on the issue of any other fault, other than the employer on [sic] this case. And in conjunction with that, we move for a Directed Verdict, because the only evidence uncontradicted, is the employer is at fault in this case....
In fact, the only evidence in this case, that could be — viewing in the light most favorable, is that Dow provided certain things. Dow did this, Dow did that. It’s unclear when Dow did all those things, prior to 1976, that’s the employers’ duty to provide a safe place to work. There’s no evidence that there’s any evidence that that happened. In fact, the evidence is totally opposite. If anybody did anything, it was Dow, who is not even in this case, who I have already moved for a Directed Verdict on that issue. Anyone else’s fault, any other causation, I have moved for a directed verdict on both issues, that there is ... no evidence on causation from asbestos exposure, other than Hebert Brothers, I move for that, and no evidence of fault of any other party.
The only evidence presented, from the stand, is that the plaintiffs have put evidence, through their witnesses ... that the employer failed to provide a safe place to work. Who cares what Dow did or didn’t do? [W]e move for a Directed Verdict, since there is uncon-troverted evidence that asbestos if is [sic] a cause, it was caused only because of the fault and the exposure, due to the employer. That’s the only evidence in this case.
Having advanced this argument throughout the trial, the plaintiffs should not be allowed to advance an inconsistent and different argument when the initial one 17no longer suits their needs. Indeed, the theory of judicial estoppel is designed to prevent this exact type of gamesmanship. Hotard v. State Farm Fire & Cas. Co., 286 F.3d 814, 818 (5th Cir.2002), citing Showboat Star P’ship v. Slaughter, 2000-1227 (La.4/3/01), 789 So.2d 554, 561. Quantum
I also disagree with the majority’s decision on quantum. 1 do not believe the jury’s determination of the amount of an award of general damages is a finding of fact as maintained by the majority. The majority cites La. C.C. art. 2424.1, which provides that the judge or jury has much “discretion” in the assessment of damages. Further, the majority suggests that its “review of the record shows no abuse of the jury’s vast discretion.” I think both statements correctly state the law that a general damage award is subject to a review for an abuse of discretion. In contrast, a special damage award is a factual determination and subject to review under the manifest error standard.
Special damages are those which refer to specific expenses that may be quantified and which arose out of the consequences of the defendant’s behavior. See Pirtle v. Allstate Ins. Co., 11-1063 (La.App.1st Cir.5/4/12), 92 So.3d 1064, 1067, writ denied, 12-1268 (La.9/28/12), 98 So.3d 839. *70 The standard of review for special damages was set forth by the Louisiana Supreme Court in Kaiser v. Hardin, 06-2092 (La.4/11/07), 953 So.2d 802, 810, as follows:
Special damages are those which have a “ready market value,” such that the amount of the damages theoretically may be determined with relative certainty, including medical expenses and lost wages. In reviewing a jury’s factual conclusions with regard to special damages, an appellate court must satisfy a two-step process based on the record as a whole: [In order to reverse,] [t]here must be no reasonable factual basis for the trial court’s conclusions, and the finding must be clearly wrong. (Citations omitted).
Thus, special damages would include past lost wages, future loss of income or earning capacity, and past and future medical expenses.
|sOn the other hand, general damages involve mental or physical pain or suffering, inconvenience, loss of gratification or intellectual or physical enjoyment, or other losses of lifestyle that cannot be measured definitively in terms of money. Boudreaux v. Farmer, 604 So.2d 641, 654 (La. App. 1st Cir.), writs denied, 605 So.2d 1373 and 1374 (La.1992). The factors to be considered in assessing quantum of damages for pain and suffering are severity and duration. Jenkins v. State ex rel. Dep’t of Transp. and Dev., 06-1804 (La. App.lst Cir.8/19/08), 993 So.2d 749, 767, writ denied, 08-2471 (La.12/19/08), 996 So.2d 1133. Much discretion is left to the judge or jury in the assessment of general damages. La. C.C. art. 2324.1. In reviewing a general damage award, a court does not review a particular item in isolation; rather, the entire damage award is reviewed for an abuse of discretion. Smith v. Goetzman, 97-0968 (La.App.1st Cir.9/25/98), 720 So.2d 39, 48.
It is only when the general damage award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances, that the appellate court should increase or reduce the award. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). Only after it is determined that there has been an abuse of discretion is a resort to prior awards appropriate, and then only to determine the highest or lowest point of an award within that discretion. Coco v. Winston Indus., Inc., 341 So.2d 332, 335 (La.1976); Turner v. Ostrowe, 01-1935 (La.App.lst Cir.9/27/02), 828 So.2d 1212, 1216-17, writ denied, 02-2940 (La.2/7/03), 836 So.2d 107.
Therefore, I believe the majority is incorrect in its assertion that the amount of an award of general damages is a finding of fact and subject to the manifest error standard of review. This appeal only involves the general damage award for 19the plaintiffs’ survival action claims. I believe a general damage award is subject to the abuse of discretion standard of review. The jury gave a general damage award of $875,000.00 for Mr. Watts’ laryngeal cancer. This was diagnosed in 1994 and resulted in the removal of his larynx and he had to live mute until his death in 2001, over seven years. The jury gave a general damage award of $2,750,000.00 for his lung cancer. It was diagnosed in the summer of 2001 and Mr. Watts died only a few months later on October 31, 2001. It is only the amount of this latter award that is being appealed, as the award for the laryngeal cancer was not appealed. The majority concludes that this award for Mr. Watts’ lung cancer was not an abuse of discretion; however, I disagree and think this amount is indeed an abuse of discre *71 tion, particularly when the amount is compared to the much lesser award for the laryngeal cancer, from which Mr. Watts suffered for a much longer time.
For these reasons, I respectfully dissent from the majority opinion. I would reverse the finding that any liability on the part of Dow was proven and, under the principle of judicial estoppel, would have prevented the plaintiffs from making that argument. Further, I would review the general damage award under an abuse of discretion standard and reduce it accordingly.