712 So.2d 491 (1998)
Stephen R. LeJEUNE
v.
UNION PACIFIC RAILROAD, et al.
No. 97-C-1843.
Supreme Court of Louisiana.
April 14, 1998.
*492 Harry Alston Johnson, III, Baton Rouge, David Andrew Fraser, Fraser, Morris & Wheeler, Lake Charles, for Applicant.
Richard E. Gerard, Jr., Scofield, Gerard, Veron, Singletary & Pohorelsky, Michael J. McNulty, III, Plauche, Smith & Nieset, Lake Charles, for Respondent.
MARCUS, Justice.[*]
On November 28, 1988, Stephen R. LeJeune was injured when, while responding to an emergency call, he drove an ambulance into an oncoming train at a rural railroad crossing on Louisiana Highway 365 north of Crowley, Louisiana. LeJeune filed this suit for damages against the train's engineer, Jack Buckner, and Union Pacific Railroad alleging, among other things, that the train crew's negligent conduct caused the accident.[1]
The ambulance was traveling west at approximately 65-70 miles per hour en route to render emergency assistance at a serious traffic accident. LeJeune, an emergency medical technician employed by Acadian Ambulance, was driving and another ambulance company employee was a passenger in the vehicle. The ambulance's emergency lights were flashing, but the siren was not sounding. The train was traveling north from Crowley to Eunice at a speed of 24 to 28 miles per hour.[2] It consisted of three cars a locomotive and two hopper cars loaded with grain. The locomotive was operating long-end forwardan industry term meaning that the locomotive appeared to be backwards with the long end in the lead followed by the cab or short end at the rear. Several witnesses testified that there was nothing unusual about this configuration and that it is often used as locomotives are capable of operating with either end in the forward position.
Because the train was running long-end forward, the engineer, Jack Buckner, was seated on the west side of the locomotive and could not see out on the east side of the train. Four other railroad employees were also in the cab with Buckner, but only two of them, a brakeman, James Mayo, and the fireman, Ernest Mitchell, were seated in a position to view anything outside the cab in an easterly direction. Mayo was seated near a window on the east side of the train and was keeping a lookout to the east. Mitchell was seated in front of Mayo and watching the area in front of the train. The conductor, Halbert Hardy, and another brakeman, John Garrett, were both seated with their backs towards the direction the train was traveling and looking out behind the train to the south. The train was emerging from a wooded area with all visibility of Highway 365 obscured *493 until a certain point where the trees began thinning out and the highway came into full view. Buckner stated that in anticipation of the upcoming perpendicular crossing at Highway 365, he began blowing the train's horn as the train crossed a trestle near the edge of the woods approximately a quarter of a mile before the crossing, and that he continued blowing the horn until after impact.
Mayo testified that he first saw the ambulance as it came off a small bridge located on Highway 365. The distance from the railroad crossing to the west end of the bridge is 779.10 feet. Near the bridge, motorists are alerted to the upcoming railroad crossing by a yellow railroad crossing sign and the roadway is also painted to indicate the approaching crossing. The crossing itself is marked by a railroad cross bucks sign. Mayo saw the flashing emergency lights and noticed that the ambulance was traveling at a high rate of speed. At this point, he believed the ambulance would either beat the train to the crossing or stop at the crossing and wait for the train to pass.
Even so, as a precautionary measure, Mayo shouted out in an effort to let Buckner know that an ambulance with its emergency lights flashing was approaching the crossing. However, Buckner was looking the other way and blowing the train's horn making it impossible for him to see Mayo or hear the message. Mayo then yelled to the conductor, Hardy, who tapped Buckner on the leg. Buckner turned his head and Mayo gave him an "easy signal." An "easy signal" is a hand signal used in the railroad industry to advise the driver of the train to take it easy, i.e., slow down and survey the situation. Mayo estimated that this entire sequence took place within three or four seconds.
Buckner testified that upon seeing Mayo's "easy signal," he immediately moved the brake handle in position for a full service brake applicationthe heaviest braking possible short of emergency braking. Two or three car lengths later, Buckner saw Mayo and the fireman, Mitchell, jump up and he moved the same handle a notch further and put the train into emergency. Buckner indicated that the impact occurred two or three seconds after the emergency brake application. Mitchell did not initially see the ambulance approaching the crossing because he was looking straight ahead and could only see out to the east by leaning back in his chair and looking out another window. He stated that he only did so after he heard Mayo shout out to Buckner about the approaching ambulance.
There is a second emergency brake handle located in the cab near Mayo's seat. A railroad company operating rule instructs any crew member to take immediate action to stop the train in emergency situations when the conductor or engineer fails to take such action. Mayo stated that he did not pull the handle near his seat and put the train into emergency when he initially saw the ambulance because he had no reason to believe that the ambulance would not stop at the crossing.
LeJeune testified that he has very little memory of the events immediately preceding the accident. He remembers the sun being very bright and does not recall ever seeing the train. The skid marks left by the ambulance indicate that LeJeune braked approximately 130 feet before the collision. These marks are consistent with the testimony of eyewitnesses Mayo and Mitchell who both stated that the ambulance slammed on its brakes just before impact. They saw the back of the ambulance rise up from the sudden braking action and then watched it skid into the train. LeJeune also testified that he lived in the area with his parents approximately eight miles from the collision scene. He stated that he had driven that stretch of Highway 365 many times before and was aware of the upcoming railroad crossing.
A Louisiana State Trooper, James Simon, was not far behind the ambulance at the time of the accident. Trooper Simon was on his way to the same traffic accident. He testified that the glare of the setting sun significantly impaired his view of the roadway. The train's log indicates that the accident occurred in late afternoon at approximately 4:45 p.m. Because of the sight impairment caused by the sun, Trooper Simon stated that he never saw the train until it was straight in front of him.
*494 After trial on the merits, the jury rendered a verdict for the defendants determining that neither Buckner nor Union Pacific Railroad was at fault for causing the accident. Plaintiff appealed. The court of appeal reversed the trial court's decision holding that the jury was manifestly erroneous in failing to find the railroad negligent with respect to the train crew's behavior. It found that the train crew's reaction to the approaching ambulance was unreasonable. The court of appeal apportioned 80% fault to Union Pacific and 20% fault to LeJeune and awarded LeJeune $1.5 million in damages plus past medical expenses of $104,334.59, both subject to a 20% reduction for his fault. Judgment was also rendered in favor of Commercial Union Insurance for its compensation intervention. Upon application by Buckner and Union Pacific, we granted certiorari to review the correctness of that decision.[3]
The sole issue for our determination is whether the court of appeal erred in reversing the jury's finding that Union Pacific was not negligent and that the sole cause of the accident was the negligence of LeJeune.
The court of appeal may not disturb the conclusions reached by a jury regarding factual matters in the absence of "manifest error" or unless a particular finding of fact was "clearly wrong." Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). A two-part test is used in making this determination. The court of appeal may only reverse the trier of fact if: (1) it finds from the record that a reasonable factual basis does not exist for the finding of the jury, and (2) it further determines that the record establishes that the finding is clearly wrong or manifestly erroneous. Stobart v. State, 617 So.2d 880, 882 (La.1993). The inquiry is not whether or not the jury was right or wrong, but whether its conclusions were reasonable ones. As long as the jury's factual findings are reasonable, the court of appeal may not reverse even if it is convinced that it would have weighed the evidence differently. Sistler v. Liberty Mut. Ins. Co., 558 So.2d 1106, 1112 (La.1990).
In negligence cases, we use a duty-risk analysis to determine whether liability exists under the facts of a particular case. Under this analysis, a plaintiff must prove that the conduct in question was a cause-in-fact of the resulting harm, the defendant owed a duty of care to the plaintiff, the requisite duty was breached by the defendant, and the risk of harm was within the scope of protection afforded by the duty breached. Syrie v. Schilhab, 96-1027, p. 4-5 (La.5/20/97), 693 So.2d 1173, 1176-77; Berry v. State, 93-2748, p. 4 (La.5/23/94), 637 So.2d 412, 414; Mundy v. Department of Health & Human Resources, 620 So.2d 811, 813 (La. 1993). Under the duty-risk analysis, all four inquiries must be affirmatively answered for plaintiff to recover. Mathieu v. Imperial Toy Corp., 94-0952, p. 4 (La.11/30/94), 646 So.2d 318, 322.
In the present situation, we begin by examining the duty owed by the railroad and its employees to LeJeune. The train crew's duty must be determined in light of the duty imposed on motorists regarding railroad crossings. As a general rule, motorists approaching a railroad crossing must look and listen for possible oncoming trains before traversing the crossing. Glisson v. Missouri Pac. R.R. Co., 246 La. 470, 476, 165 So.2d 289, 291 (1964). The law does not require motorists to stop at every railroad crossing, but "a driver cannot expect to drive with impunity through a railroad crossing where his view is obstructed." Rivere v. Union Pac. R.R. Co., 93-1132, p. 9 (La.App. 1st Cir. 10/07/94), 647 So.2d 1140, 1147. Instead, motorists must keep their vehicles "under such control as to be able to stop immediately" upon spotting an oncoming train. Hebert v. Missouri Pac. R.R. Co., 366 So.2d 608, 614 (La.App. 3d Cir.1978) (quoting Bertrand v. Missouri Pac. R.R. Co., 160 So.2d 19, 23 (La.App. 3d Cir.1964)). Moreover, if a motorist's view is obstructed, he must exercise a higher degree of caution. Glisson, 246 La. at 477, 165 So.2d at 291.[4]
*495 LeJeune was driving the ambulance as it approached the railroad crossing on Highway 365, and thus, he had a duty to exercise due care by looking and listening for an approaching train. LeJeune also had a duty to maintain control of his vehicle by slowing down or stopping if necessary, especially in light of testimony that his sight was obscured. The fact that the ambulance had its emergency lights flashing and was on its way to render aid at a traffic accident in no way relieves LeJeune of these duties. La. R.S. 32:24 grants drivers of emergency vehicles certain privileges to disobey specified traffic rules regarding things such as speed limits and red lights in emergency situations. However, the statute gives ambulances no privilege to act differently than an ordinary motorist in relation to railroad crossings.
The statutory duties imposed on the railroad and its employees regarding railroad grade crossings such as the one located on Highway 365 are twofold. La. R.S. 32:169 requires the railroad to erect cross buck signs not more than fifty feet nor less than fifteen feet from crossings. Moreover, La. R.S. 32:168 imposes an affirmative duty on the train crew to blow the train's horn continuously from at least 300 yards out until the train reaches the crossing. A corresponding duty is placed on motorists by La. R.S. 32:171 to stop whenever a train within 900 feet of a crossing blows its horn and poses an immediate hazard because of its speed or proximity to the crossing.
It is well established in our jurisprudence that a train crew can presume that vehicles approaching railroad crossings will obey the law and stop in time to avoid an accident. Ketcher v. Illinois Cent. Gulf R.R. Co., 440 So.2d 805, 809 (La.App. 1st Cir. 1983); Leger v. Texas & P.R. Co., 67 So.2d 775, 780 (La.App. 1st Cir.1953); Bordenave v. Texas & New Orleans R.R. Co., 46 So.2d 525, 529 (La.App.Orl.1950). The train need not slow down at all or attempt to stop upon seeing a vehicle approaching an upcoming crossing. Theriot v. Texas & New Orleans R.R. Co., 220 So.2d 563, 568-69 (La.App. 4th Cir.1969). It is only if a crew member notices that "the driver of the approaching car is oblivious of the on-coming train or for some other reason does not intend to stop" that the train crew becomes responsible for immediately doing everything in its power to avert the collision. Leger, 67 So.2d at 780-81; see also Wheat v. New Orleans & N.E. R.R. Co., 245 La. 1099, 1109-11, 163 So.2d 65, 69-70 (1964). In other words, "the train crew can assume drivers will bring their vehicles to a stop ... unless the vehicle's approach is so unusual as to place an ordinarily prudent man on notice the vehicle cannot be brought to a stop in time to avoid a collision." Thibodeaux v. Carlock, 392 So.2d 1084, 1086 (La.App. 3d Cir.1980). Thus, the train crew's duty was to do everything in its power to stop the train once a crew member could no longer reasonably believe that LeJeune would be able to stop the ambulance and that a collision was imminent.
The next issue is whether the train crew breached its duty by acting unreasonably under the circumstances. LeJeune contends that the railroad's employee, Mayo, should have immediately recognized the speeding ambulance with its emergency lights flashing as an "unusual approach" and pulled the emergency brake handle located near his seat. Had Mayo done so, LeJeune argues that the train would have slowed enough for at least an additional eight-tenths of a second to elapse before it reached the crossingenough time, according to experts for both sides, for the ambulance to beat the train and cross safely. LeJeune essentially attempted to prove that Mayo was negligent because he did not act differently upon first viewing the ambulance approaching the *496 crossing at Highway 365. Our duty is not to determine whether Mayo should have acted differently, but only whether his actions were reasonable under the totality of the circumstances.
Mayo's job as the train approached the crossing at Highway 365 was to operate as a lookout and watch for approaching vehicles to the east of the train. He testified that he first saw the speeding ambulance with its emergency lights flashing as it came off a small bridge. The distance from the west end of the bridge to the crossing is 779.10 feet. At this initial sighting, Mayo stated that he believed the ambulance would either beat the train to the crossing or stop and yield to the train. The jury was not manifestly erroneous in concluding that this belief was entirely reasonable given the distance of the ambulance from the crossing at the time. Even so, Mayo took precautionary measures and signaled the engineer to slow down and take it easy. Buckner immediately applied heavy breaking and put the train into emergency seconds later. By the time Mayo realized that the ambulance might not stop, it was just before impact and he could do nothing to prevent the accident.
We consider the sole cause of the accident to be the negligence of LeJeune. Apparently, the setting sun obscured his view of the roadway and prevented him from seeing the approaching train until it was too late to stop. However, "[t]emporary sun blindness, like visual impairment caused by fog or heavy rain, is a physical condition with which drivers must learn to contend in a safe and responsible manner." Lee v. State, 97-0350, p. 6 (La.10/21/97), 701 So.2d 676, 679. LeJeune testified that he lived in the area and knew about the upcoming railroad crossing because he had driven along this route many times before. Instead of complying with his duty to slow down or stop if necessary to maintain a lookout for oncoming trains, LeJeune chose to proceed in an unsafe manner by speeding through the crossing at a rate of 65-70 miles per hour. This decision was a particularly perilous one given the fact that LeJeune's field of vision was obscured by the sun. Even though he was driving an ambulance on its way to a serious traffic accident, LeJeune was obligated by Louisiana law and ambulance company policy to operate his vehicle in a safe and controlled manner. He failed to do so and the jury apparently decided that this failure was the sole cause of this accident. The jury was not clearly wrong in reaching this conclusion.
The train crew did not breach any duty to LeJeune. As there was no breach of duty, there can be no finding of liability on the part of the defendants. The court of appeal erred in finding otherwise. We must reverse.

DECREE
For the reasons assigned, the judgment of the court of appeal is reversed. The judgment of the district court is reinstated. All costs are assessed against plaintiff.
NOTES
[*] Knoll, J., recused, not on panel. Rule IV, Part 2, § 3.
[1] LeJeune also named the State of Louisiana through the Department of Transportation and Development and Acadia Parish as defendants. Both of these defendants were dismissed from the suit prior to trial. Additionally, the worker's compensation carrier for LeJeune's employer, Commercial Union Insurance, intervened seeking reimbursement for weekly benefits and medical expenses paid to or on behalf of LeJeune.
[2] The speed limit on that track was 30 miles per hour.
[3] 97-1843 (La.10/31/97), 703 So.2d 3.
[4] We note that this rule has now been codified in the revised statutes:

The driver or operator of a vehicle approaching a rail-highway grade crossing identified by the presence of a railroad cross buck sign shall slow down to a speed reasonable for the existing conditions, or shall stop if necessary, before entering the cross walk on the near side of the intersection or, in the event there is no cross walk, at a clearly marked stop line, or if none, then at the point nearest the intersecting rail of such railroad where the driver or operator has a clear view of any approaching train. The driver or operator shall listen and look in both directions along such track for any approaching train and for signals indicating the approach of a train. Having slowed or stopped in this manner, the driver or operator shall yield the right of way to any approaching train and then shall proceed only upon exercising due care and upon being sure that it is safe to proceed.
La. R.S. 32:175(A) (emphasis added).