li MARVIN, C.J.
Johnny Brewer appeals a summary judgment rejecting his demands seeking to impose vicarious liability on the State for damages arising out of a January 1991 in-terseetional collision between his vehicle and a vehicle driven by Randolph Scott, who was driving his grandnephew, 17-year-old Terry Taylor, to the hospital for treatment of a gunshot wound incurred while hunting.
Brewer contended below and here that Scott, by action of the State, had been a “foster” parent or custodian of Taylor for some 13 years before the accident occurred and, therefore, was an “agent” of the State, rendering the State hable to him because of Scott’s alleged negligence. Only the legal character of Scott’s custody [whether “foster” parent or otherwise] is at issue in this appeal of the summary judgment.
Finding that the State is entitled to judgment as a matter of law on the undisputed material facts in this record, we affirm.
FACTS
Taylor, born January 8, 1977, has lived with Scott and his wife, who are Taylor’s great uncle and aunt, in Chatham, Jackson Parish, for most of his life. Taylor was only six months old when he and his older brother were removed from their mother’s physical custody by ex parte order of the Winn Parish Juvenile Court on July 28, 1977, on allegations by the State Department of Health and Human Resources, Division of Family Services (DFS) that the mother had abused and neglected the children. Taylor’s younger sister was later removed from her mother’s custody for similar reasons.
The July 28, 1977 court order authorized the Winn Parish Division of Family Services to
take into immediate detention, Sean W. Taylor and Terry D. Taylor, and to forthwith bring said children before this Court in Chambers for such other orders for the protection of said children as this Court shall deem necessary.
_|The children’s mother was served with a summons to appear in court but the hearing was continued several times due to the mother’s hospitalization for mental illness and was never held. No further court orders were rendered until the release order of October 24,1978, discussed infra.
After the children were removed from their mother’s home in July 1977, DFS placed them in a foster home in Winn Parish with approved foster parents other than the Scotts. On October 17, 1978, DFS removed the children from that foster home after validating a report of physical abuse against other foster children in the home and placed the Taylor children in another foster home in Winn Parish, again with foster parents who were not related to them. DFS routinely advised the Juvenile Court of changes in foster care placements but was not required to seek court approval for such changes.
The Scotts had been certified by the State as foster parents in 1972, some five years *1188 before the Taylor children were removed from their mother’s home, and had contracted with DFS to serve as foster parents for other children, receiving a monthly boarding fee of $50-100 per child depending on the child’s age. Under DHHR policy in 1977, however, a child’s relatives were not eligible to be named and compensated as the child’s foster parents, even if the relatives served as foster parents for other children.
After the Taylor children were moved to a new foster home in October 1978, and at the urging of the children’s mother and grandmother who were apparently dissatisfied with the foster home placements, the DFS caseworker contacted the Scotts to ask if they would take the children, explaining to Mrs. Scott, “We can’t pay you ... as foster parents ... because they’re kin to you.” Understanding that they would not receive the monthly boarding fee they were receiving for each of the other children in their care who were not related to them, kthe Scotts agreed to take the Taylor children into their home in Jackson Parish to allay the concerns of other Taylor relatives about the children’s welfare.

The 1978 Release Order

On October 24, 1978, the Winn Parish Juvenile Court issued a “Release Order” pertaining to Terry Taylor. The order, directed to the Department of Health and Human Resources, provides:
You are hereby authorized to release Terry Taylor from Court Ordered Custody[.] Temporary custody given to Mr. and Mrs. Randolph Scott, Chatham, LA, pending further orders of [the] Court.
According to both the contemporaneous correspondence and the later deposition testimony of several state employees, Terry’s placement in the Scotts’ home was not considered a “foster care placement” to be monitored by DFS, but a “relative placement” which ended DFS’s involvement with the case.
The worker who drafted the release order explained in her deposition why the change of custody was designated as “temporary”:
[TJemporary custody was what was given to the Scotts. It was what was given by the court to us, the State of Louisiana, when the children came into care..... [T]he mother still has the right to come back and apply for custody of the children, and this ... just kept the matter ... in ... this Judicial District....
Q. Temporary custody to you, means termination of [State] custody?
A. Yes.
Q. When you terminate custody, you ask the judge to sign an order that says we grant someone temporary custody?
A. Yes.
Q. That means termination?
A. It means termination of state’s custody — yes.
Q. Could you have gone back into the Scotts’ home, after Judge Wright signed this order on October 24th, of ’78, and picked up those children?
A. No, sir.
kQ. Why?
A. Because the state no longer had custody.... [The Scotts] would have had to have abused or neglected the children ... [for the State to be able to] take the kids back into care, because they were the custodians.
(Our emphasis and brackets.)
Mrs. Scott had a similar understanding of the effect of the release order. According to her deposition testimony, she understood the order to mean that she and her husband would “have custody of [Terry] until he got grown or till something came up [that he could be returned to his mother].” Our brackets.
Before closing its file on the Taylor children, DFS arranged for the Scotts to receive financial assistance (Aid to Families with Dependent Children and Medicaid) for the Taylor children from a different state agency, the Office of Family Support (OFS), sometimes called “the welfare office” in this record. The local offices of DFS and OFS were housed in the same state office building in Jonesboro but performed separate duties and maintained separate case records. Each of the local offices was supervised by a regional office in Monroe.

*1189
The Scotts’ Dealings with the State from 1978-1987

After the release order was signed, the Scotts received monthly AFDC cheeks from OFS for the Taylor children and monthly boarding fee checks from DFS for the other children who lived with them as foster children under written boarding contracts with DFS. No boarding contracts were signed for the Taylor children. DFS caseworkers from Jonesboro or from Monroe visited the Scotts’ home periodically to monitor and report on the home’s continuing adequacy for the foster children. The workers also spoke with the Taylor children on their visits, generally inquiring about the care they were receiving from the Scotts, but did not maintain a file on the Taylor children as they did on the other children in the home.
fcOFS, on the other hand, did not make periodic home visits to persons receiving AFDC benefits. OFS routinely conducted an initial home visit as part of its eligibility evaluation but stopped doing that around 1980, according to this record.
In 1979, the year after the release order was signed, DHHR changed its policy to allow relatives to be named and compensated as foster parents, subject to the same qualification and supervision requirements applicable to non-relative placements. Under the new policy, however, a foster parent who was related to the child in his or her care could receive either the foster care monthly boarding fee or AFDC benefits, but not both.
The Scotts continued to receive AFDC benefits for the Taylor children and monthly boarding fees for the other children in their home, notwithstanding that they received only $174 per month in AFDC benefits for the three Taylor children and would probably have received about $250 for those children under a foster care placement, according to Mrs. Scott’s estimate. They made every attempt to treat the children equally, using the combined funds “the best we could to provide for all of them.”

Revocation of Foster Home Certification

On September 30, 1987, after investigating complaints of child abuse or neglect that did not involve the Taylor children, DFS revoked the Scotts’ foster home certification and removed from their home the children who had been placed there through the foster care program. The Taylor children were not removed, however, being considered to be in the home through a “relative placement” rather than a “foster care placement,” as explained above.
After the foster home certification was revoked, the Scotts no longer received monthly boarding fees from DFS, but continued to receive AFDC bbenefits for the Taylor children from OFS. Terry Taylor lived with the Scotts through the time of the January 1991 automobile accident with Johnny Brewer that occurred when Mr. Scott was driving Terry to the hospital for treatment of a gunshot wound to the leg suffered in a hunting accident.

Procedural Facts

Scott brought personal injury claims against Brewer on behalf of himself, Taylor and another child who was a passenger in Scott’s vehicle. Brewer reconvened against Scott and his liability insurer, Allstate, adding the State of Louisiana, Department of Health and Human Resources, as a third party defendant by supplemental pleadings alleging that Scott was Taylor’s foster parent at the time of the accident; that Scott’s negligent driving was incidental to his duties as a foster parent; and that the State is vicariously liable for Scott’s negligence.
DHHR filed a motion for summary judgment asserting that Scott was not Taylor’s foster parent and alternatively, that the State is vicariously liable for the actions of a foster parent only when the foster parent’s actions have injured the child, to whom the State owes a duty of care. See, for example, Vonner v. State Through Dept. of Public Welfare, 273 So.2d 252 (La.1973). DHHR claimed the law has never imposed vicarious liability on the State for injuries caused by a foster parent to a third party such as Brewer, emphasizing that Brewer did not allege the existence or breach of a duty owed by the State to him.
After reviewing the affidavits, depositions and other documents filed by both sides, the trial court granted summary judgment for *1190 DHHR, finding, “there was no foster parent relationship in this situation. No genuine— therefore no genuine issue of material fact.” The court certified the judgment as a partial final judgment, making it immediately ap-pealable under La. C.C.P. art.1915.
^Brewer argues on appeal that the facts bearing on the foster care issue are not undisputed, and that the State may be held vicariously liable for Brewer’s injuries because Scott “was acting within the course and scope of his duty to provide for the minor’s immediate medical care” at the time of the accident. Brewer contends the placement of Taylor with the Scotts “was not a private placement ... in the home of relatives, but court ordered placement pursuant to the request of the State....”
Claiming the State obtained legal custody of Taylor in July 1977 and has never obtained an order permanently releasing Taylor from the State’s custody, Brewer argues that Scott, as Taylor’s temporary custodian, should be regarded as an agent for the State while acting to meet the child’s needs. At the very least, Brewer contends genuine issues of material fact exist as to “who actually has legal custody” of Taylor and “whether the custody granted to the Scotts was intended to be temporary or permanent,” emphasizing that issues of intent are rarely suitable for resolution by summary judgment.
DISCUSSION
Our de novo review of the record causes us to conclude, as did the trial court, that the factual issues concerning Scott’s custody of Taylor are not genuinely disputed. The Taylor ehildi’en were placed in the Scotts’ home at a time when relatives were not eligible to be named as foster parents and remained in the home after the Scotts’ foster parent certification was revoked several years before this accident. The State’s respective DFS and OFS records clearly and consistently distinguish between the Taylor children on the one hand and the “foster care” children in Scotts’ home on the other. This distinction is not contradicted by, but is consistent with, Mrs. Scott’s testimony that she and her husband took Terry Taylor and his siblings into their home to avoid having the children remain in [¡foster homes with people who were not related to them, and without a contract for foster care boarding fees, with the intention that they would raise the children until they were grown or until their mother became able to care for them.
The Scotts understood in layman’s terms what the various state workers attempted to document in legal terms: that the type and duration of the placement, as well as the availability of financial assistance from the state, would be different for the Taylor children than for the other children for whom the Scotts served as foster parents.
The essence of Brewer’s alternative argument, as we appreciate it, is that even if Scott is not considered Taylor’s foster parent, Scott became Taylor’s legal custodian through a court order which did not permanently end the State’s status as Taylor’s legal custodian. Scott, then, as the temporary custodian, could reasonably be regarded as having acted as the State’s agent in seeking medical care for Taylor. Brewer argues in brief:
If an employee of DHHR was transporting Terry Taylor to the hospital in this case, the State would defend on other grounds than [those] asserted herein. In such a case, the state employee, acting in the course and scope of his employment, would provide the legal basis for making a claim against the State. Likewise, Randolph Scott was acting within the course and scope of his duty to provide for the minor’s immediate medical care.
The employer-employee relationship is one of several principal-agent relationships that may give rise to vicarious liability by the former for certain actions of the latter. The scope of the actions for which the principal is liable, however, is directly related to the degree of control that the principal has the right to exercise over the agent’s actions. As was explained in Blanchard v. Ogima, 253 La. 34, 215 So.2d 902, 906-07 (1968):
A master or employer is liable for the tortious conduct of a servant or employee which is within the scope of authority or employment, but a principal is not liable *1191 for the physical torts of a non-servant agent_ ^Although a servant may possess the qualities of an agent, all agents do not qualify as servants. The master-servant relationship cannot be equated with the principal-agent relationship. Employer-employee status may be included within the master-servant relation, but principal-agent status cannot unless the agent is also a servant_ “Servant” must be interpreted as that particular kind of agent who has a very close economic relation to, and is subject to very close control by, the principal. A servant is one who offers his personal services for a price. He is an integral part of his employer’s business and must submit to the control of his physical conduct as well as of his time. A non-servant agent contributes to the business of his employer, but he is not such a part of it that his physical acts and the time to be devoted to the business are subject to control.
Analogizing these principles to the State’s “business” of providing child care to children whose parents are unable to properly care for them, the fact that the State would clearly be subject to vicarious liability for the negligent driving of an employee or servant occurring within the course and scope of his or her employment does not necessarily mean that vicarious liability would attach for the allegedly negligent driving of an “agent” of the State who is not a servant or an employee.
The distinction rests on the degree of control that the principal has the right to exercise over the agent. It is undisputed in this record that the State exercised only informal supervision and control of the manner in which the Seotts provided for the physical, emotional and medical needs of the Taylor children from 1978-1987, and no supervision or control of the Seotts in that respect thereafter. Even should we assume that Scott was acting as the State’s agent at the time of the accident, the State was not then supervising or controlling the manner in which Scott performed his services as an agent, nor is there any suggestion in this record that the State would have had the right to do so simply because the Seotts continued to receive AFDC benefits for the Taylor children after their foster care certification was revoked. The legal character of Scott’s agency status at the time of the accident, if any, would have been that of a non-servant agent rather than a servant or an employee of the State.
hoAs this court reasoned in Daniels v. Dauphine, 557 So.2d 1062, 1065 (La.App. 2d Cir.1990), writ denied:
Assuming for purposes of discussion that [the property occupant] was [the property owner’s] agent and that [the occupant’s] conduct was tortious, nevertheless a principal is not liable for the physical torts of a non-servant agent. Only when the relationship of the parties includes the principal’s right to control physical details of the actor as to the manner of his performance which is characteristic of master and servant does the person in whose service the act is done become subject to liability for the physical tortious conduct of the actor....
... Physical conduct relates to the agent’s movements and his control of physical forces and physical details as to the manner of performance of the agent’s services ....
(Citations omitted; emphasis and brackets supplied.)
CONCLUSION
Notwithstanding that Scott was arguably “acting within the course and scope of his duty to provide for the minor’s immediate medical care” at the time of the accident, as Brewer contends, there is no suggestion in this record that the State had the right to control the physical details of Scott’s conduct in that respect, such as the manner in which he drove the automobile to transport Taylor to the hospital. The undisputed facts in this record preclude a finding of vicarious liability by the State as a matter of law, whether viewed under the foster care analysis which the trial court considered or the more general agency analysis also advanced by Brewer.
DECREE
At Brewer’s cost, the summary judgment dismissing the State from the action is AFFIRMED.
*1192 APPLICATION FOR REHEARING
Before MARVIN, C.J., NORRIS, STEWART, CARAWAY and KOSTELKA, JJ.
Rehearing denied.