768 So.2d 265 (2000)
Pamela Russell HARRIS, Individually and on Behalf of Jamie Mascarella
v.
Jeremy STIMAC, the State of Louisiana, Through the Department of Public Safety and Corrections, and Ann Stimac.
No. 99 CA 2070.
Court of Appeal of Louisiana, First Circuit.
September 22, 2000.
*266 Victor L. Marcello, Gonzales, for Plaintiffs Appellants Pamela Russell Harris, *267 Individually, and on Behalf of Jamie Mascarella.
Richard P. Ieyoub, Attorney General, John H. Ayres, III, Baton Rouge, for StateAppellee State of Louisiana, Through the Department of Public Safety and Corrections.
Before: WHIPPLE and FOGG, JJ., and BECNEL,[1] J. Pro Tem.
FOGG, J.
The issue raised on appeal in this personal injury action is whether the State of Louisiana, Department of Public Safety and Corrections/Division of Youth Services (DPSC) can be held liable for the unintentional, tortious actions of minors who are in its custody.
At age fourteen, Jeremy Wendt[2] was charged with burglary of a delivery truck and with simple burglary of an inhabited dwelling. Pursuant to a plea bargain, the state reduced the charges to trespassing. Wendt was adjudicated a child in need of supervision and committed to the custody of the DPSC for care and treatment for a period not to exceed his eighteenth birthday. On June 6, 1989, Wendt was admitted to the Joy Home for Boys in Shreveport, Louisiana.
In September of 1989, the executive director of Joy Home for Boys wrote to Peter Bon Homme, supervisor for the placement unit in the district office of DPSC, stating that the home was having problems with Wendt such as "sniffing gasoline, refusing to follow instructions, refusing to go to bed at night, leaving the dorm without permission, making threats on counselors, and refusing to get up in the morning." Shortly thereafter, Wendt was removed from Joy Home for Boys and brought to the home of his grandmother, Ann Stimac. At the time of his transfer, no other residential facilities were available.
After Wendt's transfer to his grandmother's home, Mark Carter, a caseworker with DPSC, was assigned to handle Wendt's case. Carter maintained telephone contact with Wendt, his mother and his grandmother on a regular basis. He conducted home visits and arranged for Wendt to undergo a psychological evaluation by Dr. Frederick Lee Black, who opined that Wendt might be capable of affecting an adequate adjustment within the home community setting under certain circumstances. Based on the report by Dr. Black, Carter allowed Jeremy to remain in his grandmother's home. On several occasions, Carter contacted Wendt and the local middle school regarding Wendt's enrollment in school. On March 8, 1990, Wendt telephoned Carter to advise him that he had enrolled into the South Scotlandville Alternative Learning Center, but had not attended classes. Carter warned Wendt that the procrastination could result in reassignment to a group home.
On March 14, 1990, a day Wendt should have been in school, Wendt, 17-year-old Jamie Mascarella, and Jason Day, another friend, were watching television in the living room of Ann Stimac's home, while she was at work. Mascarella went to Wendt's room to get a guitar, returned to the living room, sat in a chair and began to strum the guitar. After seeing a gun on television, Wendt went to his room to get a 20-guage shotgun that his brother had given him and that he used to hunt squirrels. He carried the gun under his arm with the stock pointed downward. Upon returning to the living room, he turned to the right and the gun fired striking Mascarella in the face. Wendt was fifteen years old at the time. It is undisputed that the shooting was accidental.
*268 As a result of the shooting, Pamela Harris filed suit individually and on behalf of her minor son, Jamie Mascarella.[3] Named as defendants were Jeremy Wendt, Ann Stimac, Cassandra Stimac (Wendt's mother), Safeco Insurance Company,[4] and DPSC.
DPSC filed a motion for summary judgment, which was granted by the trial court. Plaintiffs appealed that judgment to this court. This court reversed the trial court in Harris v. Stimac, 93-2289 (La. App. 1 Cir. 3/3/95), 653 So.2d 15, writ denied, 95-1318 (La.9/15/95), 660 So.2d 460. The case was remanded to the district court for trial on the merits.
On December 11, 1996, the trial court granted summary judgment in favor of Cassandra Stimac, dismissing plaintiff's action against her with prejudice. On the first morning of trial, March 31, 1997, the parties stipulated to the dismissal, without prejudice, of Jeremy Wendt and Ann Stimac, leaving DPSC as the only remaining defendant. After trial on the merits, the trial court dismissed plaintiffs' action against DPSC. Plaintiffs appeal, asserting the trial court erred in failing to find the state liable for the torts of Jeremy Wendt and Ann Stimac, and in failing to find the state negligent in handling Wendt's placement while he was in the state's custody.
Initially, appellants assert the state is strictly liable for the action of Wendt because he was in its custody at the time of the accident. LSA-C.C. art. 2317 states:
We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody. This, however, is to be understood with the following modifications.
One of the modifications referred to above appears in LSA-C.C. art. 2318, which, at the time of this incident in 1990, stated:
The father and the mother and, after the decease of either, the surviving parent, are responsible for the damage occasioned by their minor or unemancipated children, residing with them, or placed by them under the care of other persons, reserving to them recourse against those persons.
The same responsibility attaches to the tutors of minors.
The issue of strict liability was addressed in Opelousas Scrap Materials, Inc. v. State, Div. of Evaluation & Services, 525 So.2d 1144 (La.App. 3 Cir.1988). In Opelousas Scrap Materials, the third circuit found that LSA-C.C. art. 2318 was clear and unambiguous and should be applied as written. That article clearly stated that the responsibility for damage occasioned by minor children extends only to fathers, mothers, and tutors for the acts of their minor or unemancipated children residing with them or placed by them into the care of another. We agree with the ruling in that case.
DPSC is merely the legal custodian of children in its care. In 1990, LSA-R.S. 13:1569(11) (repealed effective January 1, 1992) defined "Legal Custody" as follows:
11. "Legal custody" means a legal status created by court order which vests in a custodian the right to have physical custody of the child or minor and to determine, where and with whom he shall live within or without the state, and the right and duty to protect, train, and discipline him and to provide him with food, shelter, education and ordinary medical care, all subject to the *269 powers, rights, and duties and responsibilities of the guardian of the person of the child and subject to any residual parental rights and responsibilities; provided that when the state of Louisiana is the party to whom custody is given, the state may authorize necessary medical treatment and/or emergency major medical treatment, if the attending physician certifies that the medical care is necessary to treat the health problem or it is an emergency medical situation. An individual granted legal custody shall exercise the rights and responsibilities personally unless otherwise authorized by the court.
We agree with the reasoning of Opelousas Scrap Materials that neither the language of article 2318 nor the theory of responsibility, based on authority and control that underlies it, suggest that DPSC can be held strictly or vicariously liable for the acts of minor children in its custody. See also Edwards v. Burgess, 96-2064 (La. App 4 Cir. 10/3/97), 700 So.2d 1129; Gooden v. State, Dept. of Health & Human Resources, 546 So.2d 279 (La.App. 3 Cir. 1989), writ denied, 551 So.2d 630 (La. 1989). Therefore, appellants have no cause of action in strict liability against DPSC for Wendt's actions.
Appellants also assert that Ann Stimac was negligent in leaving a gun in the residence and that the state is vicariously liable for Ann Stimac's actions. Appellants cite Vonner v. State, 273 So.2d 252 (La.1973) for the proposition that when a state agency obtains or accepts custody of a child, it becomes directly responsible for the care and well-being of that child, and cannot insulate itself from this responsibility by contracting such responsibility out to others to fulfill. The injured child in Vonner was himself the foster child. The issue was whether or not the state could limit its liability for injuries inflicted on the foster child by his foster parents because the state had entered into a contract with the foster parents for the board and care of the child entrusted to their custody. The supreme court held that the foster parents were fulfilling the state's responsibilities and acting for it with regard to the care of the child and that the law did not authorize the state to delegate its legal responsibility, in this respect, to others. Therefore, the state was held liable to the mother of the child. The issue in this case is distinctly different. Herein, we are asked to determine if DPSC can be held liable for injuries to a third person, inflicted by the child in its legal custody, not injuries to the child in its custody inflicted by the foster parents.
Appellants further argue that the state is responsible for the negligence of the delegated custodian, Ann Stimac, whether the foster child or a third party incurs the damage. Appellants cite Cathey v. Bernard, 467 So.2d 9 (La.App. 1 Cir.1985), for the proposition that Stimac had a higher degree of care than reasonable care, with respect to the loaded gun that was kept in her home. In Cathey, once again, it was the foster child that was killed, not a third party. The six-year-old foster child was accidentally shot by the nine-year-old son of the foster parents while the two of them were left at home alone. This court held that the foster parents had a duty of extraordinary care, which is a higher degree of care than reasonable care, that they were negligent in leaving the loaded weapon where it was accessible to the children, and that DHHR was also liable under the principle established in Vonner. That principle relates to the state's duty to the foster child, not to third parties. Accordingly, both cases relied on by appellants are inapplicable to the instant facts.
In the instant case, Ann Stimac was Wendt's grandmother, not a foster parent. Wendt was placed with her because no other appropriate facility was available. Appellants contend that Ann Stimac, therefore, should be regarded as having acted as DPSC's agent in providing for the care and housing of Wendt.
A similar argument was made in Scott v. Brewer, 31-279 (La.App. 2 Cir. 12/11/98), *270 722 So.2d 1186. In that case, a child was placed in foster care, but was removed due to allegations of abuse. The child was placed with a great uncle who was not his foster parent, but was given temporary custody and did receive AFDC for his care. Several years later, while the uncle was bringing the child to the hospital for an injury sustained during a hunting accident, they were in an automobile accident. The other driver sued the great uncle and the state, claiming the state was vicariously liable for his injuries. He argued that, if an employee of the state had been transporting the child to the hospital, he would have been within the course and scope of his employment and that would have provided a legal basis for making a claim against the state. Likewise, the uncle was acting within the course and scope of his duty to provide for the minor's immediate medical care. The court provided the following analysis of the state's vicarious liability:
The employer-employee relationship is one of several principal-agent relationships that may give rise to vicarious liability by the former for certain actions of the latter. The scope of the actions for which the principal is liable, however, is directly related to the degree of control that the principal has the right to exercise over the agent's actions. As was explained in Blanchard v. Ogima, 253 La. 34, 215 So.2d 902, 906-07 (1968):
A master or employer is liable for the tortious conduct of a servant or employee which is within the scope of authority or employment, but a principal, is not liable for the physical torts of a non-servant agent .... Although a servant may possess the qualities of an agent, all agents do not qualify as servants. The master-servant relationship cannot be equated with the principal-agent relationship. Employer-employee status may be included within the master-servant relation, but principal-agent status cannot unless the agent is also a servant.... "Servant" must be interpreted as that particular kind of agent who has a very close economic relation to, and is subject to very close control by, the principal. A servant is one who offers his personal services for a price. He is an integral part of his employer's business and must submit to the control of his physical conduct as well as of his time. A non-servant agent contributes to the business of his employer, but he is not such a part of it that his physical acts and the time to be devoted to the business are subject to control.
Analogizing these principles to the State's "business" of providing child care to children whose parents are unable to properly care for them, the fact that the State would clearly be subject to vicarious liability for the negligent driving of an employee or servant occurring within the course and scope of his or her employment does not necessarily mean that vicarious liability would attach for the allegedly negligent driving of an "agent" of the State who is not a servant or an employee.
The distinction rests on the degree of control that the principal has the right to exercise over the agent. It is undisputed in this record that the State exercised only informal supervision and control of the manner in which the Scotts provided for the physical, emotional and medical needs of the Taylor children from 1978-1987, and no supervision or control of the Scotts in that respect thereafter. Even should we assume that Scott was acting as the State's agent at the time of the accident, the State was not then supervising or controlling the manner in which Scott performed his services as an agent, nor is there any suggestion in this record that the State would have had the right to do so simply because the Scotts continued to receive AFDC benefits for the Taylor children after their foster care certification was revoked. The legal character of Scott's agency status at the time of *271 the accident, if any, would have been that of a non-servant agent rather than a servant or an employee of the State.
Scott v. Brewer, 31-279 at pp. 8-9, 722 So.2d at 1190-1191.
Although Wendt was living with Ann Stimac at the time of the accident, DPSC was not supervising or controlling the manner in which she cared for Wendt. Even if we were to accept appellants' argument, at best, Ann Stimac would be considered a non-servant agent rather than an employee of the state, and there would be no vicarious liability. In conclusion, we find the state is not vicariously liable for the actions of Ann Stimac.
Appellants next argue that the trial court erred in failing to find the State of Louisiana negligent in its handling of Wendt and, therefore, liable for the damages sustained by plaintiffs. Louisiana courts use a duty-risk analysis in negligence cases to determine whether liability exists under the facts of a particular case. "Under this analysis, a plaintiff must prove that the conduct in question was a cause-in-fact of the resulting harm, the defendant owed a duty of care to the plaintiff, the requisite duty was breached by the defendant, and the risk of harm was within the scope of protection afforded by the duty breached." LeJeune v. Union Pacific R.R., 97-1843, pp. 5-6 (La.4/14/98); 712 So.2d 491, 494. Under the duty-risk analysis, all four inquiries must be affirmatively answered for plaintiff to recover. Id. Furthermore, the determination of whether a duty exists is a question of law and the subsequent determination of whether a breach of that duty exists or does not exist is a factual question. Mundy v. Dept. of Health and Human Resources, 620 So.2d 811 (La.1993); Faucheaux v. Terrebonne Consol. Govt., 615 So.2d 289 (La.1993).
In this case, at the time Wendt was placed in the custody of DPSC, Louisiana Code of Juvenile Procedure Article 84[5] provided as follows:
In a case in which a child has been adjudicated to be in need of supervision, the court may:
(1) Place the child in the custody of a parent or other suitable person on such terms and conditions as deemed in the best interest of the child and the public;
(2) Place the child on probation on such terms and conditions as deemed in the best interest of the child and the public;
(3) Assign the child to the custody of a private or public institution or agency;
(4) Commit a child found to be mentally defective to a public or private mental institution or an institution for the mentally defective;
(5) Make such other disposition or combination of the above dispositions as the court deems to be in the best interest of the child; or
(6) Commit the child to the Department of Public Safety and Corrections for care and treatment. The department, however, shall not place a child in need of supervision in a correctional facility designed and operated exclusively for delinquent children.
Former Louisiana Code of Juvenile Procedure article 86[6] further ordered:
A. The court should impose the least restrictive disposition which the court finds is consistent with the circumstances of the case, the needs of the child, and the best interest of society. The court shall not remove a child from the custody of his parents unless his welfare or the safety and protection of the public cannot, in the opinion of the court, be adequately safeguarded without such removal.

*272 . . . .
G. The Department of Public Safety and Corrections shall have the sole custody of a child committed to the department under this Chapter and shall determine the placement, care, and treatment of the child, and the expenditures to be made therefore.
In 1990, LSA-R.S. 15:901 stated, in pertinent part:
C. (1) Upon commitment to the Department of Public Safety and Corrections, the department shall have sole custody of the child and shall determine the child's placement, care, and treatment, and the expenditures to be made therefor, through appropriate examinations, tests, or evaluations conducted under the supervision of the department. The department may transfer a child from one juvenile facility or program to another if such transfer is deemed proper to assist in the care, treatment, and rehabilitation of the child. The committing court shall be advised of all transfers of the child; however, the department need not obtain a modification of disposition to transfer a child if such transfer is deemed by the department to meet the treatment and rehabilitation needs of the child.
In 1990, LSA-R.S. 46:1903 set forth the purpose of Title 46, Chapter 22, which deals with the Division of Youth Services, as follows:
It is the purpose of this Chapter to improve, intensify, and coordinate efforts by state and local public agencies, in cooperation with voluntary agencies and organizations, citizens groups, and concerned individuals, to:
(1) Preserve the unity of the family to the fullest extent possible.
(2) Prevent children from becoming delinquent.
(3) Prevent children and the public from suffering the consequences of criminal behavior by substituting therefor programs for their supervision, care and rehabilitation, consistent with public interest and safety.
(4) Provide for coordination, planning, technical expertise, resources and adequate financial assistance for services and facilities for the rehabilitation of delinquent children to the end that they may become and remain law-abiding, productive citizens.
Finally, in 1990, LSA-R.S. 46:1905 set forth the powers and duties of the Division of Youth Services, in pertinent part, as follows:
With respect to programs for the prevention of juvenile delinquency and/or the care and treatment of delinquent children and children in need of supervision, the department, in addition to such other duties and functions as are vested in it by this Chapter, or any other law shall:
(1) Collect and evaluate data relating to the delinquency of children and the effectiveness of programs designed to prevent or reduce delinquency.
(2) To the extent that diversion from the juvenile justice system can be accomplished, with due regard to the safety of the community and the well-being of the children involved, encourage and assist in the development and conduct of innovative programs and provide needed care and services to such children outside such system to prevent children from becoming a part of or returning to such system by:
(a) Developing informational materials and standards relating to such programs, and
(b) Cooperating with and assisting other public and private agencies and organizations in the development and coordination of such programs, especially those which are community based.
The applicable laws and the jurisprudence reveal no duty owed by the state to generally protect the public from the accidental actions of a child who is residing *273 with his grandmother while in the state's custody.
Appellants assert that Wendt's history caused the state to have a duty to protect third parties from his unintentional, negligent acts. We disagree. When Wendt was removed from Joy Home for Boys, no other residential facility was available. DPSC by law could not place him in a correctional facility designed and operated exclusively for delinquent children. LSA-C.J.P. art. 84. Furthermore, any placement had to be the least restrictive disposition consistent with the circumstances of the case. LSA-C.J.P. art. 86. Within two months of his removal from the Joy Home, DPSC had a psychological evaluation completed on Wendt. In his report, Dr. Frederick Black stated, "Present information suggests that Jeremy might be capable of affecting an adequate adjustment within the home community setting." Dr. Black then listed several conditions and stated, "Should Jeremy not be making an adequate adjustment in the home community setting (as will be evidenced by school discipline reports, parent reports, and counselor reports), strong consideration should be given to an inpatient treatment program. Again, this should probably be a treatment program focusing on substance abuse issues."
Based on this information, Wendt's caseworker allowed him to remain in the home of his grandmother. From September 15, 1989, the date Wendt arrived at his grandmother's home, until March 14, 1990, the date of the accident, the caseworker had direct phone contact or written correspondence with Cassandra Stimac, Ann Stimac, school personnel, and Wendt, on at least nineteen occasions. During a telephone conversation, Ann Stimac stated that, since his return home, Wendt had not been a source of behavioral problems either in the home or in the community and requested that he be released from the custody of DPSC. A week before the accident, Wendt contacted the caseworker and advised him that he had enrolled into the South Scot-landville Alternative Learning Center. During that conversation, the caseworker instructed Wendt to telephone once a week to discuss his activities.
The record reflects Wendt's general and non-violent behavioral problems. However, the knowledge of these problems did not place a duty on the state to protect third persons from his unintentional, negligent acts. Rather, the record reflects that the state's handling of the matter was reasonable and in accordance with the law. LSA-R.S. 46:1903 required DPSC to "[p]reserve the unity of the family to the fullest extent possible." In summary, we find no duty on behalf of the state to protect third parties from the unintentional, negligent acts of this child; therefore, we find no tort liability on behalf of the state. Considering the foregoing, appellants' final assignment of error concerning damages is moot.
For the foregoing reasons, the judgment of the trial court is affirmed. Costs of this appeal are assessed against the appellants.
AFFIRMED.
WHIPPLE, J., concurs in the result.
NOTES
[1] Judge Mary Hotard Becnel of the Fortieth Judicial District Court is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] Although the original petition listed the defendant's name as "Jeremy Stimac," plaintiffs' amending petition properly lists Jeremy's name as "Jeremy Wendt."
[3] After the filing of the original petition, Jamie Mascarella reached the age of majority and was named as plaintiff herein.
[4] Safeco Insurance Company was Ann Stimac's homeowner's insurance carrier. On June 24, 1993, Safeco paid its policy limits into the registry of the court and was dismissed, with prejudice. On that same day, a consent judgment was entered into allowing plaintiffs to withdraw the funds deposited by Safeco.
[5] Louisiana Code of Juvenile Procedure article 84, repealed by Acts 1991, No. 235, Sect. 17, effective January 1, 1992, was replaced by Children's Code article 792.53.
[6] Louisiana Code of Juvenile Procedure article 86, repealed by Acts 1991, No. 235, Sect. 17, effective January 1, 1992, was replaced by Children's Code article 792.54.